**KUNZ CONSTRUCTION COMPANY**

v.

**The UNITED STATES.**

No. 83–84C.

United States Claims Court.

March 30, 1987.

Leonard J. Gittinger, Jr., San Antonio, Tex., for plaintiff.

Eileen P. Fennessey, Washington, D.C., with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, and Thomas W. Petersen, for defendant.

## OPINION

WHITE, Senior Judge.

The plaintiff, Kunz Construction Company, constructed for the Government a Cancer Treatment Facility at Lackland Air Force Base, San Antonio, Texas, pursuant to contract No. DACA63–82–C–0084.

The plaintiff sues in the present action for the additional sum of $29,178.40, over and above the contract price. The complaint alleges that the cost of performing the contract was increased as a result of changes in the original contract requirements ordered by the contracting officer during the progress of the work.

*The Facts*

The facts, as found by the court on the basis of the evidence in the record, will be set out in this part of the order.

On March 5, 1982, the United States (acting through a contracting officer of the U.S. Army Corps of Engineers) and the plaintiff entered into contract No. DACA63–82–C–0084 (the contract). Under the contract, the plaintiff agreed to construct a Cancer Treatment Facility at Lackland Air Force Base in San Antonio, Texas, and was to be paid $1,035,089 for the work. The Cancer Treatment Facility was to be an addition to Wilford Hall, an Air Force hospital that was already in existence at Lackland Air Force Base.

The construction work contemplated by the contract was later performed by the plaintiff.

Although the Cancer Treatment Facility contains a number of rooms, changes in the contract requirements with respect to only one room, BA–109, are involved in the present litigation. Room BA–109 is a lead-lined room designed for radiation therapy. The controversy between the parties arose in connection with the electrical work required in room BA–109.

Drawing Sequence No. 25 was one of the contract drawings relating to the electrical work that was to be performed in room BA–109. This drawing required (among other things) the installation of a floor duct and four conduits in room BA–109. It was not clear from the drawing, however, just where the floor duct was to be placed.

On May 17, 1982, the plaintiff submitted to the Government a Request for Information (RFI) form, seeking clarification on where the electrical floor duct in room BA–109 should be located. The Government's Authorized Representative of the Contracting Officer responded to the plaintiff's RFI on May 28, 1982, by means of a hand-written note on the RFI. This note directed the plaintiff to locate the duct according to a revised version of Drawing Sequence No. 25.

The revised version of Drawing Sequence No. 25 clarified the location of the

duct, and it also extended the length of the duct and required that a partition be installed in it. In addition, the revised drawing added a requirement relative to the installation of 6–foot and 20–foot wire tails at certain electrical connections in room BA–109, and a further requirement relative to the installation of additional conduits in room BA–109.

On August 26, 1982, the Government sent a written notice to the plaintiff concerning the addition of still more conduits of varied specified sizes in room BA–109.

Most of the additional electrical work required by the Government in BA–109— *i.e.*, the lengthening of the floor duct, the installation of a partition in the duct, the installation of wire tails at certain connections, and the installation of additional electrical conduits—was actually performed by the plaintiff's electrical subcontractor, Consolidated Service Company. That company, on September 24, 1982, submitted a bill to the plaintiff in the amount of $6,836.50 for the extra work. The bill consisted of $5,650 as direct costs and $565 as overhead at the rate of 10 percent, making a subtotal of $6,215, plus $621.50 as profit at the rate of 10 percent, thus making the subcontractor's total claim $6,836.50.

### Previous Proceedings

By means of a letter dated December 13, 1982, the plaintiff submitted to the contracting officer a claim in the net amount of $17,770, based upon the extra costs allegedly incurred in performing the additional electrical work required by the Government in room BA–109. For the plaintiff's own costs, the claim included $378 for materials and labor supplied by the plaintiff, $9,750 as "job impact costs," and $71 as insurance and payroll tax expenses; it added overhead and profit of $3,084 allegedly due the plaintiff; and it added the electrical subcontractor's bill, rounded off as $6,837. As a partial setoff, the claim proposed a reduction of $2,350 in the original contract price because of the deletion of a door operating system from the original contract requirements. Thus, the net amount of the claim was $17,770.

The contracting officer issued a final decision in a letter dated February 15, 1983. The decision rejected the plaintiff's claim for additional compensation. The contracting officer's decision, however, had been preceded by unilateral Modification No. P00005, which the contracting officer issued on January 11, 1983. This modification, in effect, allowed the plaintiff a total of $2,234 with respect to the additional electrical work in room BA–109. The figure of $2,234 included $1,754 for the electrical subcontractor's claim, $354 for the materials and labor furnished by the plaintiff itself, $71 for the plaintiff's insurance and payroll tax expenses, $24 for the coordination supplied by the plaintiff, and $31 for the plaintiff's overhead and profit, at the rate of 10 percent for each. Nevertheless, because of credits which the contracting officer allowed the Government due to the deletion of other work from the requirements of the contract, Modification No. P00005 resulted in a net decrease of $178 in the contract price.

The plaintiff received the contracting officer's final decision on February 22, 1983.

Thereafter, the plaintiff filed the present action in the Claims Court on February 21, 1984.

On October 10, 1985, the defendant filed a motion which (among other things) asked the court to dismiss the complaint in this case for lack of prosecution. The motion to dismiss was denied by the court in an unpublished order dated January 8, 1986. The court concluded, after a careful review of the proceedings up to that date, that the plaintiff had not been guilty of the sort of inordinate delay which would justify the dismissal of the complaint for lack of prosecution.

On March 11, 1986, the defendant filed a motion for a partial dismissal of the complaint, insofar as it sought compensation for additional costs allegedly flowing from a change made by the Government in the contract requirement with respect to the thickness of plaster in room BA–109. The motion for partial dismissal was based upon the ground that the plaintiff had not submitted its claim regarding the thickness

of the plaster to the contracting officer before filing its complaint with the court.

In its response to the motion for partial dismissal, the plaintiff admitted that it had failed to submit the plaster claim to the contracting officer before filing the complaint with the court. In view of the plaintiff's admission, the court granted the defendant's motion for partial dismissal in an unpublished order dated May 9, 1986.

The case was subsequently tried on the merits in San Antonio, Texas, beginning October 27 and ending October 31, 1986. The parties submitted post-trial briefs for the consideration of the court, the final brief having been filed on March 3, 1987.

*Discussion*

Jurisdiction

In its post-trial brief, the defendant asserts for the first time in these proceedings that the court is wholly without jurisdiction to adjudicate the plaintiff's claim. In view of the history of the case, which has included the defendant's motion of October 10, 1985, to dismiss the case for lack of prosecution, the defendant's motion of March 11, 1986, for a partial dismissal of the complaint on jurisdictional grounds, extensive preparations for trial by both parties, and the holding of a full-scale trial on the merits, at which all of the issues still remaining in the case were supposedly "ventilated," the defendant's current contention as to jurisdiction obviously comes quite late in the day. However, recognizing that a federal court is always obligated to consider its jurisdiction (*Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed.Cir.1983)), the court is bound to examine the defendant's present contention.

The defendant's jurisdictional argument is based upon the following provisions of the Contract Disputes Act of 1978 (codified as 41 U.S.C. §§ 601–13 (1982)):

§ 605. Decision by contracting officer

\*　\*　\*　\*　\*　\*

(c) \* \* \*

(1) A contracting officer shall issue a decision on any submitted claim of $50,-000 or less within sixty days from his receipt of a written request from the contractor that a decision be rendered within that period. \* \* \*

\*　\*　\*　\*　\*　\*

(5) Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the \* \* \* suit on the claim as otherwise provided in this chapter. \* \* \*

\*　\*　\*　\*　\*　\*

§ 609. Judicial review of board decisions

(a) Actions in United States Claims Court; \* \* \* time for filing

(1) \* \* \* [A] contractor may bring an action directly on the claim in the United States Claims Court, notwithstanding any contract provision, regulation, or rule of law to the contrary.

\*　\*　\*　\*　\*　\*

(3) Any action under paragraph (1) \* \* shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim, and shall proceed de novo in accordance with the rules of the \* \* \* court.

It has been mentioned earlier in the opinion that the plaintiff's claim was submitted to the contracting officer in the form of a letter dated December 13, 1982. This letter (among other things) requested that the contracting officer render a decision on the claim within 60 days. Accordingly, it was obligatory upon the contracting officer under section 605(c)(1) to render a decision on the plaintiff's claim within 60 days from his receipt of the plaintiff's letter. Unfortunately, there is no evidence in the record concerning the date on which the plaintiff's letter of December 13, 1982, was actually mailed in San Antonio, Texas; and, although the copy of the plaintiff's letter in evidence shows that it was sent by certified mail, return receipt requested, there is no evidence in the record concerning the date on which the plaintiff's letter was actually

received by the contracting officer in Fort Worth, Texas.

The defendant's argument seems to be that, in view of the lack of evidence just mentioned, the court must presume under RUSCC 6(c) that the contracting officer received the plaintiff's letter of December 13, 1982, by December 16, 1982; that, on the basis of such presumption, the 60–day period within which the contracting officer was required by section 605(c)(1) to render his decision expired on February 14, 1983; that the contracting officer's failure to render his decision within the 60–day period must be deemed under section 605(c)(5) to have been a decision on February 14, 1983, denying the plaintiff's claim; that the 12–month period allowed the plaintiff by section 609(a)(3) for the filing of an action on the claim in this court accordingly began to run on February 14, 1983, and expired 12 months after that date; and that the plaintiff's complaint, which was filed on February 21, 1984, was filed too late and must be dismissed because the time periods prescribed by the Contract Disputes Act are jurisdictional (citing cases).

The defendant's argument is rejected by the court. In the first place, the keystone of the argument is that the court must presume under RUSCC 6(c) that the contracting officer received the plaintiff's claim by December 16, 1982. That provision of the rules states that "[w]henever a party has the right or is required to do some act or to take some proceeding within a prescribed period after the *service* of a paper, except a court order, and the *service* is made by mail, 3 days shall be added to the prescribed period" (emphasis supplied). Rule 6(c), however, is wholly irrelevant to the issues in the present case, as the service of a paper by mail is accomplished on the *date of mailing* (RUSCC 5(b)). The issues in this case with which we are now concerned have to do with the receipt of documents, whether delivered by mail or otherwise. The contracting officer's 60–day period for the issuance of his decision on the plaintiff's claim began to run upon his *receipt* of the plaintiff's claim, including a request that he render a decision within the 60–day period.

If the defendant had raised this jurisdictional issue during the course of the trial, the court could have called for the production of evidence relative to the date on which the contracting officer received the plaintiff's claim; and such evidence should have been forthcoming in view of the fact that the plaintiff's letter submitting its claim was sent by certified mail, return receipt requested. Moreover, if a resolution of this particular factual issue were deemed essential to the disposition of the case, the court would even now reopen the record for the reception of relevant evidence on the issue.

Actually, the answer to the critical question of whether the plaintiff's claim was timely filed does not depend on the date when the contracting officer received the plaintiff's claim, but, rather, on the date when the plaintiff received the contracting officer's decision. Section 609(a)(3) states in clear, unequivocal language that any action in the Claims Court on a contract claim "shall be filed within 12 months from *the date of the receipt by the contractor of the decision of the contracting officer concerning the claim * * * *"* (emphasis supplied). It is clear, therefore, that the 12–month limitation period for the filing of an action in this court on a contract claim does not begin to run until the receipt by the contractor of the contracting officer's decision on the claim. *Malissa Company v. United States,* 11 Cl.Ct. 389, 390–91 (1986); *LaCoste v. United States,* 9 Cl.Ct. 313, 315 (1986); *Vemo Co. v. United States,* 9 Cl.Ct. 217, 218–22 (1985); *Turner Construction Co. v. United States,* 9 Cl.Ct. 214, 215 (1985); *G & H Machinery Co. v. United States,* 7 Cl.Ct. 199, 201–03 (1985); *contra, Pathman Construction Co. v. United States,* 10 Cl.Ct. 142, 149 (1986), *appeal docketed,* No. 86–1537 (Fed.Cir. July 30, 1986) (an unusual case involving a recalcitrant contracting officer who, over a period of more than 8 years, refused to render a decision on a claim that had been submitted to him).

■ In the present case, the evidence in the record shows (as stated in the findings

of fact) that the contracting officer's decision was issued in Fort Worth on February 15, 1983 (*i.e.*, on the day after the day when, according to the defendant's argument, the contracting officer's 60-day period expired), and that the decision was received by the plaintiff in San Antonio on February 22, 1983, some 7 days later. Consequently, the plaintiff's statutory period of 12 months for the filing of an action in the Claims Court began to run on February 22, 1983, and it expired 12 months later on February 21, 1984. Accordingly, the plaintiff's complaint was timely filed on February 21, 1984.

While we are on the subject of jurisdiction, it should be mentioned that the claim which the plaintiff has presented to the court includes an item of additional expense—*i.e.*, increased home-office overhead in the amount of $11,408.40—which the plaintiff allegedly sustained as a result of the extra electrical work required by the Government in room BA–109, but which was not included in the claim which the plaintiff submitted to the contracting officer.

The Contract Disputes Act declares in part, and in mandatory language, that *all* claims by a contractor against the Government relating to a contract shall be in writing and *shall* be submitted to the contracting officer for a decision (section 605(a)). Accordingly, it is the general rule that the Claims Court does not have jurisdiction under the Contract Disputes Act over claims which a contractor has failed to present to the agency's contracting officer. *Paragon Energy Corp. v. United States*, 227 Ct.Cl. 176, 177, 645 F.2d 966, 967 (1981); *Newport News Shipbuilding & Dry Dock v. United States*, 7 Cl.Ct. 549, 555 (1985). In the present case, as previously stated, the contracting officer did not have an opportunity to consider and pass upon the plaintiff's claim based upon increased home-office overhead.

■ It should be noted, however, that the plaintiff's claim before the court for increased home-office overhead arose from the same set of operative facts concerning the additional electrical work in room BA–

109 which formed the basis for the claim which the plaintiff submitted to the contracting officer. The case law permits the Claims Court to exercise jurisdiction over a claim the dollar amount of which has been enlarged in this court over the amount presented to the contracting officer: (1) if the increase in the amount of the claim is based on the same set of operative facts previously presented to the contracting officer (*LDG Timber Enterprises, Inc. v. United States*, 8 Cl.Ct. 445, 452–54 (1985); *Shea Co. v. United States*, 4 Cl.Ct. 46, 54–55 (1983)); and (2) the court finds that the contractor neither knew nor reasonably should have known, at the time when the claim was presented to the contracting officer, of the factors justifying an increase in the amount of the claim (*LDG Timber*, 8 Cl.Ct. at 454).

■ In this case, the plaintiff was and is a very experienced contractor. As such, it certainly seems that the plaintiff reasonably should have known, at the time when it presented its claim to the contracting officer, that the necessity of performing the additional electrical work in room BA–109, with resulting delay in the overall performance of the contract, had undoubtedly increased the plaintiff's home-office overhead expenses. Indeed, the plaintiff does not contend that, when its claim was submitted to the contracting officer, it was unaware of increased home-office overhead due to the extra electrical work in room BA–109. Rather, the plaintiff says that it was unaware of its right to include an item for increased home-office overhead in its claim to the contracting officer. Consequently, as the plaintiff should reasonably have included an item for increased home-office overhead in the claim which it submitted to the contracting officer, but failed to do so, the court concludes that it cannot properly take jurisdiction over the increased home-office overhead item which the plaintiff has included in the claim presented to the court.

### Liability

■ On the basis of the court's findings of fact, the court determines that the

lengthening of the floor duct, the installation of a partition in the duct, the installation of wire tails at certain electrical connections, and the installation of electrical conduits, in addition to the four conduits shown on the original Drawing Sequence No. 25, represented additional electrical work in room BA–109 required by the Government over and above the original contract requirements.

This comment is added to the court's determination that the installation of electrical conduits in room BA–109, other than the four conduits shown on the original Drawing Sequence No. 25, represented additional work required by the Government over and above the original contract requirements.

The defendant cites paragraph 8.1 of the technical specifications of the contract, which states in part that "[u]nless otherwise indicated, wiring shall consist of insulated conductors installed in * * * conduit * * * "; and, according to the defendant, this meant that all wiring in the Cancer Treatment Facility, wherever located, must be installed in a conduit. However, paragraph 8.1 plainly states in the opening phrase that if it were otherwise indicated, the contractor would not be required to install wiring in conduits. Certainly, the failure of the original Drawing Sequence No. 25 to show more than four conduits in room BA–109 can reasonably be construed as "otherwise indicating" that only four conduits were required in that particular room. This construction is supported by paragraph 2.2 of the technical specifications, which states in part that "[t]he contract drawings indicate the extent and the general location and arrangement of * * * conduit and wiring." Moreover, if different provisions in a contract, when considered together, create an ambiguity concerning the requirements of the contract, a court should interpret such provisions in a manner that favors the non-drafting party. *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979); *Tibshraeny Brothers Construction, Inc. v. United States,* 6 Cl.Ct. 463, 468 (1984).

In the present case, therefore, the court has determined that the original contract requirements called for the installation of only four conduits in room BA–109.

The plaintiff is entitled to recover for the damages sustained as a result of the additional work required by the Government.

### Damages

The complaint in this case does not raise any objection to the amounts of $354 and $71, respectively, which the contracting officer in Modification P00005 allowed the plaintiff (1) for the materials and labor furnished by the plaintiff itself in the performance of the extra electrical work in room BA–109, and (2) for the plaintiff's insurance and payroll tax expenses. Moreover, the complaint does not object to the credits which the contracting officer allowed the Government because of deletions from the original contract requirements. Consequently, the court need not concern itself with these matters.

A major item of damages with which the court must deal, however, relates to the reasonable cost of the extra work performed by the electrical subcontractor in room BA–109. As previously stated, the electrical subcontractor submitted to the plaintiff a bill in the amount of $6,836.50 for the performance of the extra work; the plaintiff incorporated the amount of the subcontractor's bill in the net claim for $17,770 which the plaintiff submitted to the contracting officer; and the contracting officer's decision on the plaintiff's claim allowed the amount of $1,754 for the electrical subcontractor. In the plaintiff's claim that is now before the court, the plaintiff still lists $6,836.50 as the amount due the electrical subcontractor.

The amount of $6,836.50 allegedly due the electrical subcontractor includes expense items of $2,150 as the alleged cost of the materials, including core-drilling materials, and $3,500 as the alleged cost of the labor used in performing the additional electrical work in room BA–109. As the evidence in the record indicates that the per hour cost in San Antonio at the time involved here of the type of labor utilized in performing electrical work was approxi-

mately $15.49, the $3,500 figure for labor presented by the subcontractor to the plaintiff, and by the plaintiff to the court, apparently is based upon the utilization of approximately 226 man-hours of labor.

The evidence which the defendant presented at the trial concerning the cost of performing the additional electrical work in room BA–109 was based upon the assumption that the original contract required the installation of all the conduits which the electrical subcontractor actually installed in room BA–109, whereas the court has held that the conduits, other than the four shown on the original Drawing Sequence No. 25, represented additional work. Because the defendant's evidence relative to this matter is based upon an incorrect assumption, it cannot be relied on as an accurate representation of the cost of performing the additional electrical work in BA–109 required by the Government.

At the trial, the plaintiff presented Daryl H. Klecka as a witness to express his opinion on what it reasonably should have cost the electrical subcontractor to perform the additional electrical work in room BA–109. Mr. Klecka is president of the Nathan Alterman Electric Company, of San Antonio, which is an electrical contractor operating mainly in the field of commercial electrical construction and design. The Nathan Alterman Electric Company bids on electrical work; and, as president of the company, Mr. Klecka has the final say about the company's estimates. Before becoming president of the company approximately 18 months before the trial of the case in October 1986, Mr. Klecka served the company as vice president in charge of engineering for approximately 6 years; and, in that position, he was in charge of the design and estimating work. Earlier, Mr. Klecka worked for the company as a full-time estimator. Mr. Klecka graduated from the University of Texas in 1972, with the degree of Bachelor of Science in Mechanical Engineering. He is a registered engineer in the State of Texas.

Mr. Klecka estimated the reasonable cost of the materials, including core-drilling materials, needed by the electrical subcontractor to perform the additional electrical work in BA–109 as $1,999. This is very close to, and supports, the plaintiff's figure of $2,150 for materials; and the court concludes that the plaintiff's figure should be accepted.

With respect to the reasonable cost of the labor required by the electrical subcontractor to perform the additional electrical work in room BA–109, Mr. Klecka's estimate of $1,812, which is based upon 117 man-hours at a wage rate of approximately $15.49 per hour, varies widely from the plaintiff's figure of $3,500 as the cost of labor. This wide disparity leads the court to conclude that the labor hours (approximately 226) claimed by the plaintiff are excessive. Both the plaintiff and Mr. Klecka were dealing with the performance of the same amount of work, and yet the plaintiff's claimed hours (approximately 226) are almost twice the number of hours (117) which Mr. Klecka estimates as reasonably needed. In light of this, the court concludes that the 117 man-hours of labor and the $1,812 in labor costs estimated by Mr. Klecka should be adopted. Consequently, the court allows the sum of $1,812 as the reasonable cost of the labor utilized by the electrical subcontractor in performing the additional electrical work in room BA–109.

In addition, the plaintiff claims, and Mr. Klecka's estimate includes, 10 percent for the electrical subcontractor's profit; and this is also adopted by the court.

With respect to the electrical subcontractor's overhead, the plaintiff claims 10 percent, whereas Mr. Klecka's estimate includes a 15 percent allowance for overhead. The 10 percent claimed by the plaintiff concerning this item is adopted by the court.

■ Consequently, the plaintiff is allowed a total of $4,794.02 as the reasonable cost of the additional work performed by the electrical subcontractor in room BA–109. The figure of $4,794.02 consists of the following items:

| Materials | $2,150.00 |
|---|---|
| Labor | $1,812.00 |
| Subtotal | $3,962.00 |
| Subcontractor's overhead at 10 percent | 396.20 |
| Subtotal | $4,358.20 |
| Subcontractor's profit at 10 percent | 435.82 |
| Total | $4,794.02 |

The plaintiff's claim also includes an item which is referred to as "job impact costs," and which is based upon the contention that the requirement for the performance of the additional electrical work in room BA–109 delayed the completion of the contract and increased the cost of contract performance. This item was included in the $17,770 net claim which the plaintiff submitted to the contracting officer and, therefore, is not subject to objection on jurisdictional grounds.

In this connection, although there is some confusion on the point, the plaintiff seems to assert that the delay in contract performance occurred mainly, though not exclusively, during the period from September 10 to October 10, 1982.

■ The most persuasive evidence in the record regarding the extent to which the extra electrical work in room BA–109 adversely affected the plaintiff's performance of the contract is found in defendant's exhibit 35. This exhibit reveals that although the plaintiff was 26 days ahead of schedule on September 10, 1982, the plaintiff was only 16 days ahead of schedule on October 10, 1982. Consequently, it appears that the plaintiff actually lost 10 days of its "lead time" during this period. This seems to be the only concrete evidence before the court concerning the existence and duration of any delay in the overall performance of the contract that might properly be attributed to the requirement for the performance of the additional electrical work in room BA–109. In light of this, the court concludes that 10 days should be deemed to be the number of days of delay in the performance of the contract attributable to the extra work required by the Government in room BA–109.

At the trial, the plaintiff's accountant testified that the indirect costs of each day of delay amounted to $360.53. An accountant for the Government also appeared as a witness on this matter, and testified that a figure somewhat lower than $360.53 per day would be proper. The government accountant admitted on cross-examination, however, that the approach used by the plaintiff's accountant was consistent with generally accepted accounting principles. The court deems it appropriate to accept the plaintiff's figure of $360.53 per day of delay. The plaintiff is therefore entitled to recover for 10 days of delay at $360.53 per day, or a total of $3,605.30 as the plaintiff's job impact costs.

In its claim to the contracting officer, the plaintiff asked for overhead and profit allowances at the rate of 10 percent each, and these percentages were accepted by the contracting officer. In its claim before the court, the plaintiff seeks an overhead allowance at the rate of 12 percent and a profit allowance at the rate of 10 percent. The plaintiff, however, has not made any sort of persuasive showing why the overhead rate should be increased from 10 percent to 12 percent, and the plaintiff's request to that effect is denied by the court.

For the reasons previously stated, the court determines that the damages properly allowable on the claim presented to the court should be calculated as follows:

| Extra work by electrical subcontractor | $4,794.02 |
|---|---|
| Plaintiff's job impact costs | $3,605.30 |
| Subtotal | $8,399.32 |
| Plaintiff's overhead at 10 percent | 839.93 |
| Subtotal | $9,239.25 |
| Plaintiff's profit at 10 percent | 923.92 |
| Total | $10,163.17 |

The contracting officer, in Modification P00005, has already allowed the plaintiff $1,754 for the extra work performed by the electrical subcontractor, $31 for the plaintiff's overhead and profit, and $24 for the plaintiff's coordination (an aspect of overhead). These items, totaling $1,809, should be deducted from the figure of $10,163.17,

leaving $8,354.17 as the amount still due the plaintiff.

### CONCLUSION OF LAW

Upon the facts as found by the court, and the discussion in the opinion, the court concludes as a matter of law that the plaintiff is entitled to recover the amount of $8,354.17 from the defendant.

The clerk will therefore enter judgment for the plaintiff in the amount of $8,354.17.

Each party shall bear its own costs. IT IS SO ORDERED.